Case on today's docket is the case of Vandalia Levee and Drainage Dist. v. Fred Keck and Parrish Holdings, L.P. We have Ms. Penny Levenston for the appellant, and we have Mr. Patrick Schaufelberger. Thank you. You may proceed. Thank you, Mr. Court. The Vandalia Levee District has been struggling with impacts to their levees for some period of time due to the activity of building illegal levees by Mr. Fred Keck. Even Mr. Keck's engineer, who the Court found to be unsatisfactory in spite of the judgment, even he admitted that the standard in Illinois for levee building is that prior to building a levee on land, you must obtain a permit from the Illinois Department of Natural Resources. That's the standard in Illinois. That's what Bob Dalton testified to as an engineer. That's what Brian Martindale testified to as an engineer. And when you go to IDNR to get a permit, you have to show IDNR through Keck-Grass modeling that your levees will not impact your neighbor's land negatively. Had this analysis been done, it would have been seen that they could not get a permit. Mr. Keck did not undertake obtaining an IDNR permit. He just put in five miles of levees, and those levees are documented extensively in the record. There are photographs of them. They were measured. The testimony was about size of trees, how do you know the age of these levees, and he admitted building the levees. And the engineering testimony is that these levees not only are causing overtopping of the Vandale levees, the gauge data from 93 years was plugged into this engineering model, and this is the state-of-the-art model that IDNR requires, and that Nedemeyer, even though he doesn't know how to do one and has never reviewed one, says is the standard to do. Mr. Brian Martindale did these types of models and analyzed these models for permitting for IDNR for 28 years. And at a very great cost, he performed these models and continuously added more and more data, went out and shot gray, put all this data in, and his modeling shows the levees overtop 53 times the level at the Vandalea levee district. However, it's not the overtopping of the levees that has caused so much damage to the Vandalea levee district. It is the seepage. It is the fact that now, during minor storm events, the data was what you're doing with the levees, obviously you're narrowing the amount of area that the water can travel through, and this narrowing is causing more head pressure on these levees. And so what has happened is where the Vandalea levee district might have pressure on their levees every 100 years, now they're having pressure on their levees every two to three years, and we're seeing it scour in and take the levees out. We had two major highways blown out, and the levee repairs for Vandalea levee district, we didn't ask for damages that the Corps of Engineers has paid. Millions of dollars are invested in these levees. And why IDNR doesn't enforce the law, we don't know, but both Mr. Dalton and Mr. Neddemeyer thought they should enforce the law when they worked for them, and the Vandalea levee district hired them to do these studies after the fact to help them prove that in fact these five miles of levees were causing damage to the levee district. If you look at Mr. Kett's lease, his hunting lease, it says that at the end of the lease he should remove all artificial structures that he built. Who owns the property? Well, now that is a problem. Well, I couldn't figure it out. Neither could I, and I was at trial. Well, what happened is Mr. Kett transferred, Mr. Kett owned most of the property, and then he leased I think 400 acres, I'm not sure on the acreage, from Parrish, and he has a lease agreement with them for $100,000 a year. And the rest of the land he bought from Dease and Rozier. So he owned most of that land. Then in the middle of the litigation, he transferred it to his company, GAFF, something freight service. And then at trial, his counsel stipulated to the admissibility of the deeds and to his ownership, but during the examination he said, I don't know anyway, which was definitely news to us. And then we went in and researched it, and it turned out the divorce attorney came to our hearing and deposed the son during one of the hearings. Who came? The divorce attorney that represents Mr. Kett's wife came to the hearing and wanted to make sure that John Kett, the son, would go to a deposition and that he wasn't testifying so that he couldn't get out of his deposition. And apparently he testified, and I don't have the record on that, that there was a side deal with his dad. But here's the thing. Whether Mr. Kett owns the land or not, he is the equitable owner of the land. He not only put in all of these levees, but he has leasing rights to all of the land where the levees are put in. And he is the equitable owner of this land. This is his hunting operation where basically they have the levees there so that you stop the rain from coming into the levees in the spring and summer while you're growing the crops. Then you leave a portion of the crops. And then in the fall, they pump the water back into the area so that the waterfowl are a captive hunt situation. So there's farming in addition to the hunting? Yeah. I think maybe 400 or 600 acres are farmed. The trial judge, he was pretty articulate, it seems like, in making his decision. Did he ever explain why he didn't think that Mr. Kett didn't have a permit? He didn't have a permit. Was that ever addressed by the trial court? You can't do something without a permit. Is that correct? Right. Well, originally, I had a count that I called statutory nuisance and used the Rivers and Stream Act as the standard for how you would get a permit. You can't have an adverse impact. And the engineering shows that the Vandalia levee district is getting three feet of water in some locations and that they are getting water at 13 different locations. But the trial judge browbeat me into dismissing that count, and it really doesn't have a private right of action in the statute. It's pretty clear in the statute that there's no intended private right of action. Right. But that doesn't mean you can't use it as a standard. That's what I would say, because you had three engineers say, well, the standard in Illinois is you don't get to build a levee until you have a permit from ID&I. And the reason therefore, I mean, obviously, whatever the reason is, that you need to have a permit to build a levee. Right. Well, to show no adverse impact on your need. And I believe the amicus brief written by the Farm Bureau,  then you don't get to do what you should have a permit for. Okay. I didn't mean to. No, no, because I'm really here to solve any problems that you have. Well, it's pretty complicated. I don't know if you can solve them all. It is pretty complicated, but it is also relatively simple. From the point of view that you have a parish admitting that for 20 consecutive years, really it was 40, that water has crossed Pecan Island. So you have a prescriptive right to flood that. You have recorded on the deeds of all the Pecan Island lands a flood easement from the Army Corps of Engineers that if you put the levees up, you're violating the deed restriction of your own land. And why are those deed restrictions on?  Well, it's going to flow from the one channel, and it wants to go to that other channel, the dead channel, that also needs cleaned out, which is part of our request for injunctive relief to alleviate the flooding. And so here we have a prescriptive easement to flood, and we have recorded on the deeds the right to flood. And when you look at the Vandalia levee district's levees, they are all permitted by ID&R. They were originally permitted under the 1911 statute. Now it's the 1985 modifications to it, and also all of their levees are certified by the Corps, and they are investing taxpayer money. The people in that district pay special taxes to keep those levees in good condition, and it protects 11,000 acres of prime farmland and peripherally protects another 37,000 acres of land. So this is an important case, and when you look at how much levee building, we're not talking about, you know, this little levee the size of your bench. We're talking about 24,000 feet of building of levees. And, you know, Mr. Keck testified that he's constantly repairing the levees, constantly repairing. He's constantly repairing because that's where the water wants to go. That's where the water is supposed to go. And when you restrict the flow because of those levees, then you are impacting the levees on the other side of the river, and you're sending the water further and further back, and it's scouring because it has this head pressure on it, and it's destroying the levee district's levees. And now one of the ñ I don't know if I would have described the judge's statements or writings as articulate, but one of the things that he says is that, and this seemed to be a pivotal point, that while he found Mr. Neddemeyer's testimony unsatisfactory, that he did point out a fatal flaw in the modeling. And Mr. Neddemeyer was the expert for Keck, correct? I guess you could call him an expert. He was a witness for Mr. Keck. Okay. Testified he didn't know how to do head press modeling, didn't know how to review it, didn't ever review the data in advance, but that he was hired to question the validity of the whole study, even though he never reviewed the raw data that he said he thought was lacking. Very interesting testimony. But anyway, the judge said, well, Mr. Neddemeyer said you didn't use flow data. What Mr. Neddemeyer actually said was you didn't have any rain data. Well, the rain data would be irrelevant because it doesn't matter what rain event you're having when you do this model. The model is to say you have a restriction on this side of the river, you have a restriction on this side of the river. Whatever the rain event is, which is all determined by the gauges that actually measure the flow in the river, this is real data. And the real issue is what if there's no level? Because now you don't have the restriction and the water can flow. So the model is looking at what happens when you restrict the water on both sides and what happens when you don't. And when you look at the testimony, even the judge asks Mr. Martindale questions. And Mr. Martindale says, yes, I looked at all of the other lobbies that are grandfathered in. And yes, I used real gauge data to see what the flow was. So there was absolutely no impeachment of the engineering reports and the engineering data that was done. And Mr. Neddemeyer, their witness, wouldn't know how to do it anyway if that's what he admits to. So I know that there's a quote from the judge where he says, my grandmother always said, you know, figures never lie, liar's figure or something. But I guess the Farm Bureau's right when they argue that the reason why you go get an IDNR permit is because IDNR has the experts who know how to do the engineering analysis. I don't know that I agree with them that the court should order him to go get a permit. Instead, I think the court should order him to remove the levies because they're illegal and they don't belong. And they're causing an adverse impact on the levy district's levies. And when the levy district went through all of their expenses to see where, for a very long period of time, they spent $43,000 on repairs. And then you get to modern times. In 2002, you have all of these blowouts. And now they're starting to spend hundreds of thousands of dollars. And they did do setbacks where they put them back a little further and rebuild them. And they didn't charge that to Mr. Keck for their, I think it's $396,000 in damages. I thought they were really generous in the way that they looked at that. And you have not only Brian Martindale, but you also have Mr. Dalton, who brought a physical model to show the judge, you know, with and without levies. And Mr. Dalton also testified that you've increased the water surface elevation and that that has a negative impact and that it will continue to degrade these levies. And that's what this is all about. Mr. Cripe, who is on the board of the Vandalia Levy District, testified that there have been 13 major breaks in 2002 alone. I think Highway 51 was closed for three months. Or Highway 40 was closed for three months and Highway 51 was closed for a couple weeks. I mean, this really does have a devastating impact to the area. Mr. Keck doesn't control rainfall, but by putting in such an extensive levy system on this island where the water is supposed to flow, where the easements say it should flow, where it's flowed for at least since 1947, that's when Mr. Deese died and no one was doing any levy repairs after 1947 and everyone agreed on that. And really in 1943 is when the flood came through and blew out the Conn Levy District's levies. And that levy district disbanded because it couldn't possibly keep up. And Mr. Keck can't keep up. He's constantly repairing levies. That's why all of the levy system, according to the evidence, is less than five years old. But he's been making repairs since 1989. So he's been making repairs constantly. Why? Because that's where the water goes. That's where the water is supposed to go. And when he puts these obstructions up, he's stopping the flow. He's backing it up on the Vandalia Levy District's levies. And it's causing significant harm to them. And that harm was proved. In fact, Mr. Martindale's specific testimony on the obstruction of flow was that the construction of these levies reduces the effective width of the Kaskaskia River by approximately 4,400 feet. Well, that's significantly reducing the width of the floodplain, which creates this head. And then you have the head pressure, which is now harming our levies during minor events. So it's not the overtopping that is so much the concern, although that information went into the modeling as well. And there was 100 years of data use. I think another issue I raised was in cross-examining Mr. Neddemeyer, the judge did not allow any questions to be asked of Mr. Neddemeyer as to his prior litigation or any prior findings against him for negligence or his prior dealings. And I thought that was inappropriate to shut that questioning down, particularly since he seems to be involved in most flooding cases. Did you offer a show of proof? I was shut down very quickly, although the judge did allow questions of Mr. John Phillips for quite a while about his dad having a lawsuit with Mr. Keck. But when I asked Mr. Neddemeyer questions about his own negligence, I was immediately shut down. But did you ask the court to present an offer of proof? I don't remember that I did it like that. I struggled to have this case in front of Judge Ratchett. What I'm saying is I don't know. We can't consider what it is that you hope to have shown through that inquiry. But I think I should have been allowed to ask the questions to impeach a witness properly by his prior conduct in flooding cases. Do you have the necessary skill? And by the way, Mr. Neddemeyer testifies that he only did work on one levy in his 29 years of experience, which was for Mr. Keck. And so he doesn't know how to do a heck grab. He doesn't know how to review it. He didn't look at the raw data. He testifies that his purpose is to challenge the validity of the study. Gee, it ought to be to see if the study's right if you're an independent expert. And then the court was saying that Neddemeyer found this fatal flaw that obviously the testimony shows is not a fatal flaw. The whole point of the heck grab model is to look at the flow data, and they looked at 93 years of flow data. So it was very frustrating. Am I correct that you presented evidence that there had been no damage for 40 years until Keck built the levies? Is that correct? Right. Well, I mean, they were making minor repairs on their levies. What was the basis of that 40 years? Did you have an expert say that, or who testified to that? That there was no damage for 40 years until Keck built it. We had an exhibit that showed how much money, I think it's exhibit 44, that showed how much expenses that the Vantelli Olympic District was using to repair their levies. But I think where the 40 years comes in, because I'm not sure if that's a figure in there, they go through the whole thing of what they do, but for 40 years the water flowed across there without Mr. Keck obstructing the flow because in 1943 all the levies were blown out. And there's a recorded document with the Reporter of Deeds where it disbands the Pecan Island Levy District because the 43 flood blew out their levies and the Corps of Engineers wouldn't give them any money to fix it, so they just disband. And then you had Mr. Deese die in 1947, so when Mr. Keck gets there and starts making repairs in 89, you've got 42 years where nobody could have been making repairs. Originally he argued that under the Rivers and Streams Act he was grandfathered in because he was repairing the levy instead of building new levies. The problem with that is he didn't buy the land until 1988, and that act says that anyone who had their levy in place in 1985 is grandfathered in. Well, you've got five miles of levies that are not five years old. It's a little hard to argue that you're repairing. And then you have Bob Dalton, who was in charge of the ID&R permitting process for, I think, 20 years, and Bob Dalton testifying that when he was out there as an ID&R employee, he sure didn't think it was in serviceable condition. He thought that the levy had been blown out. So they dropped the grandfathering argument by the time they got to the trial court. I guess at that point that's when the ownership issue came up as well. I know these really are hard issues. But it did seem like, I know that summary judgment is not favored, but when you're a practitioner out here and you have all your evidence together and you can save your clients a trial, it's something that is sometimes worthwhile doing. And I guess I would at least point out that if you look at what was proved at trial and you look at what was stated in all of the verified affidavits and all the documentation for summary judgment, nothing different really happened other than Mr. Keck transferring ownership at the beginning of the year and not telling us. But you don't, Mr. Walker, before he died, testified. He also had an affidavit, pretty consistent. He farmed that area for 35 years, didn't see any levies. Then you have Mr. John Phillips, who went out there and saw the levy-building activity and was shocked that he testified to that. And the levy district guys went out and saw Mr. Keck's levies as well. So when you have no issues of material facts, summary judgment would be appropriate, and there was no contesting of the facts that were presented. So I also think summary judgment should have been granted. Thank you, Ms. Livingston. You'll have the opportunity for rebuttal. Thank you. Thank you. You may proceed, Mr. Shuffleberger. May it please the Court. One thing is certain from the briefs and from the argument that you'll hear is that our take on these issues is decidedly simpler than, and I believe the judge's analysis is simpler than what counsel's take on it is. A few facts that I think, and I want to respond to some of the questions and some of the thoughts of counsel factually. It bears mentioning that the amount of acreage that is contained in the levy district is approximately 12,000 acres, and it is upstream from Pecan Island. Pecan Island is essentially formed where the Kaskaskia Channel splits and forks, winds around and then comes down to a confluence. Created thereby is this island that contains about 1,100 acres. So the economies of scale are that we're talking about the impact that 1,100 acres, that is south and downstream from, would have on the 12,000 acres that lies north. And I think that's an important point. Just common sense would dictate that how much impact would what's going on on a tenth of the acreage have on something upstream that is ten times larger in square area. Your Honor, it is indeed the case that in this part of the world that levies are essential to maintain productivity with ground. It happens everywhere on the Kaskaskia floodplain. It takes property that would otherwise be worthless, and it essentially allows the owner to maintain productivity, sometimes via agriculture, and then other times with this property, also water value. It's also a fact that once in a floodplain levies are constructed, that it's going to necessarily increase pressure on other levies. That's a fact of life. Counsel in her theories in this suit sought relief under a nuisance theory, prescriptive easement theory, and essentially an alteration of natural flow theory. With respect to the nuisance theory, it was the court's take, and it was certainly consistent with our argument that the landowner downstream has just as much right to maintain its levies as the plaintiff did. There was no indication by counsel or in her case that the levies on the Con Island were improperly constructed. In fact, the testimony was that they were shorter from base to crown than the levies that were part of the Vandalia Levy District. Also, the court found, and I believe it warrants reiteration, that the Con Island levies would do no more harm naturally than the levies of the Vandalia Levy District would do to the Con Island. They increased pressure. That's a fact of life. That happens everywhere. As to the prescriptive easement theory, the court found, and we believe that it's correct, that there was no evidence supporting that there was 20 years of continuous flow so that a prescriptive easement was created. Nor do we believe that the... I'm interested in the continuous flow theory. What do you understand was the fatal defect in their proof there? I just don't believe they proved that that was for a continuous period. I don't think they offered testimony connecting all that to them. Talking again about the typical elements that we have with adverse possession or a prescriptive easement, where one of them has a continuous period of 20 years, and I believe that's the one that was fatal. And so the period that Ms. Livingston talked about with respect to the levies being blown out and the levies being disbanded from Con Island and nothing taking place for approximately 40 years, you believe was not shown? I don't believe that. I don't believe a 20-year continuous period was supported by the record. I think that's a direct comment from the judge. Well, I understand that, but I'm not sure that I understand what defect or what was lacking in that proof, even from the judge's record. I don't believe that the entire 20-year period... I don't think there was direct testimony about a continuous flooding for a 20-year period. Oh, so you think there had to be proof of continuous flooding during that period? Yes. As opposed to intermittent? I believe that's what the judge said. Like daily flooding, or what is continuous flooding? That's a good question. I don't know. I don't know the answer to that, but it seems to me like very consistent steady flooding. I can't respond to that. I don't know the answer. Tell me about the permanent. Why would Mr. Keck not have to get a permanent? When that was discussed, and I think it's enlightening for this court to look at the June order. There was a June order where the judge essentially took the position that we're not going to get into that. What kind of position is that? I mean, with all due respect. I think that he's basically saying, my recollection is that he was saying that the lack of a permit is not relevant in that that in and of itself doesn't create any sort of private cause of action. But isn't it some evidence that there is a purpose behind a public role being played by the necessity to get a permit before you can build a levee? Doesn't that imply that there's some concern about health and safety of the public? Your Honor, I think that opened up a whole other round of evidence that we got into this issue early on as to whether or not the levees on the Conn Island were in serviceable condition.  And the levees that were in serviceable condition when the law changed essentially were grandfathered in. And so the court made a finding that the levees were in serviceable condition? I don't think that he did. I think the court said, irrespective of whether we're not going to get into that, because I assume for the sake of discussion, the counsel's right that a permit was required. The lack thereof doesn't give you a right to a private cause of action, and coupled with that is no guilt. But it certainly is evidence or perhaps a reason that you can't just decide to build a levee on your own property where it may in fact, well it will in fact, other landowners' property. And I think coupled with that is that no governmental entity today has sovereignty enforcement. So I think the court was assured, at least in part through that, that it wasn't an issue at the time. I'm not sure what the judge was thinking, but I understand the court's point. A couple of other points I think that the judge made that I think are simplistically yet very salient and relevant. And that is in paragraph 25, the court says that further all witnesses who testified on the subject were in agreement that the widening of the main channel in Cascaspia was being caused by discharging water from Lake Shelbyville. And that's at the bottom of paragraph 25. Lastly, the court says the fact that plaintiff's levees have failed from time to time, subsequent to the building of Keck's levees, does not constitute any proven evidence that Keck's levees or Pecan Island levees have been the cause of those failures. Simply because they occurred after that doesn't connect them up. Can I ask you something? Sometimes you say Keck's levees and sometimes Pecan Island. Is there any difference? Are there any other levees on Pecan Island now other than Keck's? Thank you. I was utilizing that term of art simply for simplicity. It's a matter of fact that at the time of trial, Keck didn't have any ownership interest. Keck had deeded to this company approximately 800 acres. Parish Holdings remained the owner of rather than 400 acres. So when I say Keck's levees, I guess I should say levees at the time of trial that were owned by Guaranteed Air Freight and Florida, Inc., as counsel suggested. But over time, those levees have been at least maintained by Keck, yes. Since Keck had obtained an interest in the property, Keck, Fred Keck, was somebody who had maintained and repaired those levees. He provided his direction. So for financial arrangements, he may not have had any kind of fee or leasehold ownership, but he maintained control over it.  Keck maintained control over the levees in that he was monitoring them and making repairs. Is that correct? Yes. Is that your position? Yes, at least until they were conveyed, which was sometime between, I believe, the litigation was initiated and when it was concluded. I also know that I can say that I don't know that it's relevant when he's gone through a divorce. I'm sorry, could you say that again? Could you say that louder, please? I'm sorry. I said that I believe at the inception of the litigation, sir, that, and I think counsel did title it, that Keck had an ownership interest in at least 700 or 800 of those acres, whereas Parrish Holding had the other acres. I can also say that during the period after Keck acquired the ownership, sometime thereafter, he became a farm tenant on the property of Parrish Holding, which is approximately one-third of the acres. As to when Keck divested himself of an interest, I believe that was sometime in the interim between when the litigation was initiated and when the judge's order occurred. Did he exercise any control over the levies in that area that he had conveyed after the time of conveyance? I don't believe he did, no. That's all I have. Thank you. Thank you. Ms. Livingston, you have the opportunity for rebuttal. We had Brian Martindale, Bob Dalton, and Pat Metamire, the three engineers in the case, all saying that the standard in Illinois before building a levy is to get an ID&R permit. Whether the statute is being enforced here or not, that's the engineering standard. That's the standard that engineers go by in fulfilling their code of ethics, which says do no harm. You have the post-development runoff exceeding the pre-development runoff, if you want to call the levies development. The thing is, he filled all these levies without a permit, so we don't know did he meet the standard, except we know he didn't because we undertook the engineering study. When Mr. Schaffelberger says there's no evidence of continuous flow for 20 years, if you look at Exhibit No. 4 in the plaintiff's pendants, you'll see that there's an abstract that goes through February 2001, and it shows abstract note, last entry of Judge's docket in the drainage levy district was in 1943. There is no activity in the district since. The following document, Exhibit 5, shows that the levies on Pecan Island were blown out in 1943, and they didn't have the funds to fix them, so they were petitioning to disband their levy district. You also have the fact that Mr. Keck testified that when he got to Pecan Island in the 80s, the entire island was a lake, and he talked about the big blowouts and driving semis through the levy system. You had Don Walker testify that his family farmed that for 35 years up until the 1970s, and he never saw any levies. His response to one of my questions was, what levies? Then you have John Phillips, who's a tenant farmer until Mr. Keck takes ownership, and after about a year of Mr. Keck's ownership, he's not a tenant farmer, and he testifies. There weren't any levies, and oh, my God, when I came back in the fall to spray antihydrosomonia, I saw all this new levy-building activity. So you have the evidence of the continuous flow for more than 20 years by the circumstances of everything. You have no levies to stop the flow. You have continuous flow. The levies are blown out, and I think most importantly, and I think that this is actually very important, is you have the admissions of Parrish Holden in answer to the complaint where in paragraph 109, and this is admitted by Parrish, Plaintiff wrote in the complaint, given the fact that the area of interest is prone to flooding, an engineering analysis suggests that the unlawfully constructed Pecan Island levy significantly increased the chance of flooding within the Vandalia Levy District. Damage due to flood events like May 2002, May 2004, and January 2005 are certain to repeat, and they admitted that. You also have Parrish admitting that for more than 20 consecutive years, Pecan Island has been subject to flooding. This is an admission of Parrish. Apparently, the court and Mr. Shuffelberger is distinguishing continuous flooding. Well, it would only flood when it would flood. When's the rainfall events coming? You can't change how nature operates. It would be the fact that you accept whatever the flood events are for that period of time. And also, I heard him say that there didn't seem to be any proof of impact. He was talking about Mr. Keck only protects 1,000 acres and the levy district protects 11,000 acres, but we're talking about how much surface you put on the edge of the river, and Mr. Keck put five miles of surface on that river to get that head pressure to go backwater effects onto the Vandalia Levy District. Would you like to have another question? No, I'm done. Oh, okay. Well, we had 13 blowouts in 2002, and according to the modeling, there were 53 flood events that would have overtopped, according to the gauge data, overtopped the Vandalia Levy District, and we're talking about scouring and these minor storms. So one more thing that Parrish admitted to is they admitted that the Cond Island flooding took place with the knowledge and acquiescence of the property owners on the Cond Island. Of course, it would have to. You have a recorded flood easement on your deed from the United States of America so that they have the right to periodically, and that's how it's worded, I believe, flood this area. So as far as continuous, well, nature wouldn't make it continuous. So what would your prescriptive easement be but what nature would do? And we have a 43-year period where nature is allowing the water to come across the Cond Island, and so it needs to continue to come across the Cond Island, and the standard is that if you don't have a permit, if you can't show the land first impact, you don't get to build your levels. And independent of did he get a permit, we've already shown, and there's nothing in the record to say any different. There's no impeachment of his testimony and his evidence. We have very extensive engineering analysis that shows there is an adverse impact. In 13 locations on the Vanda and the levees, you're getting back water effects from the flow data, and it shows that the 53 flood events, but it also shows that you've got three feet of water coming out. Thank you. Thank you, Ms. Livingston. Mr. Shuffles, we'll take the matter under advisement and render ruling.